718 A.2d 1150

## SECRETARY, DEPARTMENT OF PUBLIC SAFETY AND CORRECTIONAL SERVICES and Commissioner, Division of Correction

### v.

### Vincent HENDERSON.

### No. 39, Sept. Term, 1998.

### Court of Appeals of Maryland.

### Oct. 8, 1998.

Andrew H. Baida, Asst. Atty. General (J. Joseph Curran, Jr., Atty. General; Maureen M. Dove, Alan S. Eason, Scott S. Oakley, Asst. Attys. General, on brief), for petitioner.

Ralph S. Tyler (Douglas R.M. Nazarian, Hogan & Hartson L.L.P., Baltimore; Eugene J. Yannon, Bowie; Dwight Sullivan, American Civil Liberties Union of MD, Baltimore, all on brief), for respondent.

Stephen Z. Meehan (David C. Wright, Joseph B. Tetrault, Prisoner Rights Information System of MD, Inc.), Chestertown, in support of respondent on amicus curiae.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

We granted *certiorari* to review an order of Judge Joseph H.H. Kaplan, of the Circuit Court for Baltimore City, directing that the State Division of Correction release Vincent Henderson from custody. We shall affirm that order, but for different reasons than those used by Judge Kaplan.

This appeal requires that we revisit two earlier decisions—
*Md. House of Correction v. Fields,* 348 Md. 245, 703 A.2d 167
(1997) and *Beshears v. Wickes,* 349 Md. 1, 706 A.2d 608 (1998).
Those cases and this one involve the method of calculating
diminution credits that prisoners are eligible to earn for good
conduct while incarcerated, and it would be helpful to begin by
reviewing that subject.

Inmates in the State correctional system are generally
eligible to earn four kinds of credits against their sentences—
credits for good conduct, for performing work tasks assigned
to them, for satisfactory progress in vocational or other edu-
cational and training courses, and for special work projects.
All of those credits are provided for in Maryland Code, Article
27, § 700. Credits for work tasks (five days a month), voca-
tional or educational courses (five days a month), and special
projects (up to ten days a month) are awarded monthly, as
earned. Credits for good conduct, however, are deducted in
advance, subject to being forfeited if the inmate misbehaves in
various ways.

Until 1992, good conduct credits were deducted at the rate
of five days a month. Section 700 provided, in relevant part,
that an inmate was allowed "a deduction in advance from the
inmate's term of confinement" at the rate of five days for each
calendar month, "from the first day of commitment to the
custody of the Commissioner [of Correction] through the last
day of the inmate's maximum term of confinement." Md.
Code, Art. 27, § 700 (1992 Repl.Vol.). Section 700(a) defined
"term of confinement" as

"(1) The length of the sentence for a single sentence; or

(2) The period from the first day of the sentence beginning
first through the last day of the sentence ending last for:

(i) Concurrent sentences;

(ii) Partially concurrent sentences;

(iii) Consecutive sentences; or

(iv) A combination of concurrent and consecutive sen-
tences."

That statutory regime worked quite well so long as all inmates were eligible for the same number of monthly credits, regardless of the crime for·which they were sentenced or the dates upon which their respective sentences were imposed. An inmate serving a single ten-year sentence received, in advance, a credit of 600 days (five days per month times 120 months) upon the first day of commitment. An inmate sentenced to two consecutive five year terms also received a credit of 600 days upon the first day of commitment, as his or her sentences were aggregated in accordance with § 700(a) to constitute a single term of confinement, commencing on the first day of the first sentence and ending on the last day of the second sentence.

When, through the application of these and any other credits earned, the inmate served his or her effective sentence, the inmate was released on what is known as mandatory supervision. That term is defined in Article 41, § 4–501(13) of the Code as "a conditional release from imprisonment which is granted to any person sentenced after July 1, 1970 to the jurisdiction of the Division of Correction who has served the term or terms, less the deductions provided for in Article 27, §§ 700 and 704A of the Code." [1] Persons released on mandatory supervision remain in legal custody until expiration of their full term and are subject to all laws, regulations, and conditions applicable to parolees. *See* Article 41, § 4–612(b) and (c). If they violate the conditions of their mandatory supervision, they may be returned to prison to complete their sentence. How much time they will be required to serve on the preexisting sentence will depend on the extent to which the good conduct credits earned during their previous incarceration (that led to their release) are forfeited, and what, if any, credit is given to them for "street time"—the time they spent out of prison prior to their current infraction.

---

**1.** Section 704A of Article 27 allows for similar credits during any period that the inmate was detained in a correctional facility prior to sentencing. Those credits are applied against the sentence ultimately imposed for the crime.

This relatively simple scheme became complicated as the result of 1992 Md. Laws, Ch. 588. In that Act, the General Assembly (1) amended § 700(d)(2).to retain the good conduct credit of five days a month for "an inmate whose term of confinement includes a consecutive or concurrent sentence for either a crime of violence as defined in Article 27, § 643B of the Code or a crime of manufacturing, distributing, dispensing, or possessing a controlled dangerous substance, as provided under Article 27, § 286 of the Code," and (2) enacted a new § 700(d)(3), to provide that, for all other inmates, "this deduction shall be calculated at the rate of 10 days for each calendar month...." Section 2 of the Act made the new law applicable "only to a term of confinement imposed on or after October 1, 1992." Neither the definition of "term of confinement," in § 700(a), nor the direction in § 700(d)(1) that good conduct credits were to be deducted in advance was changed by Ch. 588.

The 1992 law immediately created a distinction between inmates serving one or more sentences for a crime of violence or a listed drug offense and inmates incarcerated for other crimes. That, when coupled with the prospectivity language of Section 2 of the Act, created a double problem: it brought into question whether an inmate serving a sentence imposed prior to October 1, 1992 as well as a sentence imposed after that date was entitled to the additional five days a month credit on the later sentence and, even if such an inmate ordinarily would get the additional credit, it raised the question of whether that would be the case if the earlier sentence was for a violent or listed drug offense.

The problem first surfaced in *Md. House of Correction v. Fields, supra,* 348 Md. 245, 703 A.2d 167. In 1988, Fields was sentenced to ten years imprisonment for daytime housebreaking, five years of which were suspended. He received an additional two-year sentence, to be served consecutively, for violating a probation imposed as the result of a possession of heroin conviction. Through the application of various diminution credits, Fields was released on mandatory supervision in 1992. In February, 1994, he was convicted of theft and

malicious destruction of property, for which he received an eighteen-month sentence. That conviction led to (1) a consecutive six-month sentence for violating one probation, (2) execution of the suspended five-year term for daytime housebreaking, to be served concurrently, and (3) revocation by the Maryland Parole Commission of his mandatory supervision release. As part of the revocation of the mandatory supervision, the Parole Commission rescinded all of the good conduct credits earned prior to Fields's release but allowed certain credits for "street time." In accordance with the directions set forth in § 700, the Division of Correction aggregated the three terms of confinement—eighteen months, six months, and five years—into a single seven-year term and awarded new good conduct credits, in advance, against that term at the rate of five days a month. It awarded the five days because it determined that Fields's "term of confinement" included sentences imposed prior to October 1, 1992—the remainder of the sentences imposed in 1988—and that it therefore commenced on the first day of that sentence. Contending that he was entitled to ten days a month credit on the post-October 1, 1992 sentences, which would produce a release date eighteen months earlier, Fields filed a petition for *habeas corpus.*

The Division's position was based on a strict application of the concept and definition of "term of confinement." If the inmate was serving a term of confinement that included a sentence imposed prior to October 1, 1992, the inmate continued to receive only five days a month. That would preclude inmates, such as Fields, who received a post-October 1, 1992 sentence for a non-violent, non-drug crime from receiving the benefit of the additional five days a month for that new sentence. We did not believe that the Legislature intended that result. We noted that the intent of the statutory direction to aggregate overlapping or consecutive sentences into a single term of confinement was "to ensure that inmates serving more than one sentence at a time [would] not receive good conduct credits for more than one sentence." *Fields, supra,* 348 Md. at 264–65, 703 A.2d at 177. After examining some of the legislative history of Ch. 588, we determined that,

in this context, the term was ambiguous and needed to be read in a "commonsensical" manner. We observed, for example, that "where an inmate is serving two consecutive sentences, one imposed before October 1, 1992 and one imposed after that date, it would be impossible to say that a single "term of confinement" was imposed either before or after October 1, 1992 because, in fact, the "term of confinement was imposed both before *and* after that date." *Id.* at 266, 703 A.2d at 178.

The ambiguity led us to invoke the rule of lenity, requiring that the ambiguity be construed "against the state and in favor of the [inmate]." *Id.* at 267, 703 A.2d at 178. Application of that rule required the construction that inmates receiving sentences imposed on or after October 1, 1992 for non-violent, non-drug offenses were eligible to receive a rate of ten days of good-conduct credits per month with respect to the post-October 1, 1992 sentence. *Id.* To achieve that end, which was the legislative desire, we rejected "the notion that all sentences that overlap or run consecutively must aggregate *for all purposes* to a single term of confinement" and, instead, held "that sentences imposed before October 1, 1992 are separable from new sentences imposed after that date." *Id.* at 267–68, 703 A.2d at 178 (emphasis added). We decided that "[f]or the purposes of good-conduct credits, new sentences imposed after October 1, 1992 should be construed as separate instead of aggregated as part of one single term of confinement," thereby effectuating the legislative intent that good conduct credits of five days a month be awarded for sentences imposed prior to October 1, 1992 and that credits of ten days a month be awarded for non-violent, non-controlled dangerous substance offenses imposed on or after that date. *Id.* at 268, 703 A.2d at 178. As to Fields, that meant that he would get the five days with respect to the balance of the seven years imposed before October 1, 1992, and ten days for the other sentences.

*Beshears v. Wickes, supra,* 349 Md. 1, 706 A.2d 608 raised the second aspect of the problem noted above; the factual circumstances were different, but the principle was the same. Wickes had been convicted of rape, a violent crime, in 1979.

Through the application of diminution credits, he was released on mandatory supervision in 1993. In 1995, he was convicted of a new non-violent, non-drug crime, for which he received a seven-year sentence. When he returned to prison, he was thus serving the balance of his twenty-year sentence for rape and the new seven-year sentence. Because one of those sentences was for a violent crime, the Division of Correction, aggregating the sentences as it had done in *Fields*, effectively awarded Wickes only five good conduct credits a month on his post–1992 sentence for the non-violent, non-drug crime. Consistent with our approach in *Fields*, we rejected that result and held that, for purposes of calculating good conduct credits under § 700, a sentence imposed for a non-violent, non-drug related offense on or after October 1, 1992 does not aggregate with a sentence for a violent or listed drug offense imposed prior to that date. The result in *Wickes* really was dictated by our holding in *Fields*—that the definition of "term of confinement" in § 700(a) should not be read to frustrate the legislative intent that inmates receive ten days a month good conduct credit against sentences imposed for non-violent, non-drug offenses on or after October 1, 1992. Fields could not be denied that benefit on the ground that one of his sentences was imposed prior to October 1, 1992, and Wickes could not be denied that benefit on the ground that a pre-October 1, 1992 sentence was for a violent crime.

Unfortunately, we used some language in *Wickes* that went beyond what was necessary to the decision, and it is that language, rather than the actual holdings in *Fields* or *Wickes*, that has led to this case. Going beyond the rule of lenity, which would have dictated the same result in *Wickes* that was reached in *Fields* and also confined the ruling to those situations in which strict application of the § 700 definition of "term of confinement" would preclude inmates from receiving the benefit of the 1992 law, we enunciated a broader conclusion that " 'term of confinement' does not aggregate sentences imposed before and after the defendant is released on mandatory supervision." We stated:

"Where a defendant is released on mandatory supervision and later commits and is sentenced for a new crime, we hold that the new sentence and the old sentence reimposed upon revocation of mandatory supervision release do not aggregate to form one term of confinement for the purpose of § 700. The rate at which an inmate is awarded good-conduct credits should not depend on the Maryland Parole Commission's decision to revoke mandatory supervision release for a prior conviction based on a subsequent offense."
*Wickes,* 349 Md. at 9, 706 A.2d at 612.

Applying that "holding," the Division proceeded to recalculate sentences and release dates for about 2,000 inmates serving multiple sentences, one or more of which was imposed before a release on mandatory supervision or parole and one or more of which was imposed for conduct occurring while the inmate was on mandatory supervision or parole. Mr. Henderson was such a person. Henderson was first imprisoned in 1975, upon a conviction for robbery with a deadly weapon. He received a twenty-year sentence, which was due to expire in August, 1995. He was paroled in 1983, but that parole was revoked in 1988. As a result of the revocation and the application of various diminution credits, the expiration date for the 1975 sentence was adjusted to July 8, 1998. In 1991, Henderson was paroled again, but, in July, 1994, he was convicted of a new crime—possession with intent to distribute cocaine—for which he received a ten-year sentence. The expiration date of that sentence was July 4, 2004. By reason of the new conviction, Henderson's parole was revoked; after the application of various diminution credits, the expiration date of the unserved part of the 1975 sentence became January 17, 1999.

Because the 1975 sentence was for a violent crime and the 1994 sentence was for a listed drug crime, Henderson clearly was not eligible for the ten days a month good conduct credit. His situation, therefore, is quite different from that of Fields and Wickes. By aggregating Henderson's two sentences in accordance with Article 27, § 700(a), the Division of Correction determined his single term of confinement as running

from August, 1975—the beginning of the twenty-year sentence—to July 4, 2004, the end of the ten-year sentence. Calculation of good conduct credits at the rate of five days per month based on that single term of confinement yielded 1,529 such credits which, when added to other diminution credits earned by Henderson, produced a mandatory supervision release date of July 7, 1997, and that is the date he was released.

After reading *Wickes*, filed some 20 months later, the Division determined that Henderson's two sentences should not have been aggregated into a single term of confinement, but should be considered separately, thereby producing two different release dates—January 17, 1999 for the 1975 sentence and July 4, 2004 for the 1994 sentence. Applying the various credits to the 1975 sentence produced a mandatory supervision release date of September 11, 1993, but the mandatory supervision release date for the 1994 sentence would not be until February 25, 2002. Upon that determination, the Division issued a "retake warrant" for the arrest of Henderson as an "escaped prisoner." The face of the warrant charged Henderson with having escaped from the Division of Correction and ordered his immediate apprehension. It stated that the warrant was issued "as a result of a court decision requiring a recalculation of the offender's term of confinement and will expire on 2002/07/03." In an accompanying letter, the Division made specific reference to *Wickes* and advised Henderson, among other things, that that decision "obligates the Division of Correction to begin recalculation of sentences in certain categories," that the warrant was issued to expedite his return, and that it was not the Division's intent to charge him with the crime of escape. Henderson was apprehended pursuant to the warrant on May 5, 1998 and returned to the Division's physical custody. He had been free for about ten months and, so far as this record indicates, had complied in every respect with the conditions of his mandatory supervision. The State conceded that there was no basis, other than the Division's recalculation of his diminution credits in accordance with the quoted language in *Wickes*, for his arrest and return to custody. It appears that the Division issued retake

warrants for 88 other former inmates as well, who, like Henderson, had been released on mandatory supervision based on a pre-*Wickes* calculation of good conduct credits, and that approximately 53 had, in fact, been apprehended.

Henderson filed a petition for *habeas corpus,* alleging that his renewed incarceration, effected pursuant to a retroactive application of *Wickes,* constituted a violation of (1) his Federal and Maryland Constitutional right to due process of law, and (2) Federal and Maryland prohibitions against *ex post facto* punishment. Judge Kaplan found merit in his complaints and ordered the Division, forthwith, to release Henderson. The judge concluded that Henderson's re-incarceration (1) constituted a violation of Henderson's right to due process of law, (2) amounted to an unconstitutional application of an *ex post facto* law, and (3) was fundamentally unfair. He also questioned whether the State had the authority to arrest Henderson after he had been lawfully released and had committed no violation of the conditions of his release.

Judge Kaplan reviewed briefly our decisions in *Fields* and *Wickes,* noting, inferentially, that they rested on the rule of lenity and quoting, in part, our statement in *Fields* that the rule of lenity forbids the extension of punishment "to cases not plainly within the language" of the statute. *Fields, supra,* 348 Md. at 267, 703 A.2d at 178 (quoting *State v. Fabritz,* 276 Md. 416, 422, 348 A.2d 275, 279 (1975)). He observed that neither *Fields* nor *Wickes* required the Division "to recalculate the good-time credits accumulated by incarcerated inmates" or indicated that they were to be applied retroactively. Although vigorously contested by the State, Judge Kaplan determined that the State had conceded that its revised method of calculating good time credits, in conformance with the language used in *Wickes,* created a "new law." He also concluded that Henderson had a Constitutionally protected liberty interest in continuing on parole (presumably meaning on mandatory supervision release), which cannot be denied without notice and an opportunity for hearing. Those rights, he found, were denied Henderson, who was arrested without notice or the opportunity for hearing. The damage, he said, had already

been done and was beyond redemption: "[a]llowing for hearing now, after the fact, to determine whether the State's calculations are correct, simply does the parolees [*sic*] no good whatsoever now that the damage is done."

The due process concerns expressed by Judge Kaplan extended beyond the procedural deficiencies of lack of notice and opportunity for pre-arrest hearing. He also concluded that it was "fundamentally unfair for the State based upon its unilateral interpretation of *Wickes* to arbitrarily and capriciously recalculate Henderson's diminution credits and thereby serve to deprive him of his constitutionally protected liberty interests." In essence, Judge Kaplan found a violation of substantive as well as procedural due process.

Having determined that the revised method of calculating good conduct credits, in accordance with the language used in *Wickes,* amounted to a "new law," Judge Kaplan, after examining two Supreme Court cases—*Weaver v. Graham,* 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) and *Lynce v. Mathis,* 519 U.S. 433, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997)—concluded that application of that new law to Henderson, who had already been released under the preexisting law, would amount to the unconstitutional application of an *ex post facto* law. In reaching that conclusion, he rejected the State's argument that Henderson's release was simply the product of the Division's erroneous construction of the law and that, having been informed by this Court of the error, it was authorized, and obliged, to correct that error.

Upon those findings and conclusions, Judge Kaplan, on May 14, 1998, entered an order declaring that Henderson's incarceration was unlawful, arbitrary, capricious, and in violation of his Federal and State Constitutional rights. He found that Henderson was entitled to a writ of *habeas corpus* and ordered the defendants—the Secretary of Public Safety and Correctional Services and the Commissioner of Correction—to release Henderson immediately and reinstate his mandatory supervision release.

The defendants, whom we shall henceforth refer to as the State, promptly noted an appeal to the Court of Special Appeals, filed a petition for *certiorari* and a motion for expedited review in this Court, and moved for a stay, first before Judge Kaplan and, when that motion was denied, in this Court. We granted the petition for *certiorari* and the motion for expedited review but denied the motion for stay, largely because the State informed us that it had already released Henderson (and, it appears, the other 53 inmates who had been re-incarcerated).

Addressing the bases used by Judge Kaplan in ordering Henderson's release, the State urges that it neither deprived Henderson of due process of law nor applied an *ex post facto* law. Its position is that, based on this Court's holdings in *Fields* and *Wickes*, Henderson is not entitled to be free, and the State was fully authorized to apprehend and re-incarcerate him. It urges that no new law was applied to Henderson— that the Division of Correction released him because it had misinterpreted the law and, when that misinterpretation was brought to its attention in *Fields* and *Wickes*, it simply applied the correct interpretation. Unlike the normal parole violation situation, the State exercised no discretion here, and there were no disputed facts to be resolved through a hearing. Noting our statement in *Wickes* that "[t]he sentencing of a defendant for a subsequent offense while he is out on mandatory supervision release for a prior offense is a separate sentencing event," 349 Md. at 11, 706 A.2d at 613, the State believes that "[u]nder this required interpretation of § 700, Mr. Henderson is not entitled to be released until February 25, 2002 ... [and that] [t]he Division of Correction has no authority to exempt Mr. Henderson from completing the term of imprisonment to which he has been sentenced merely because the Division previously calculated his release date erroneously."

## DISCUSSION

As indicated, Judge Kaplan based his determination that Henderson could not be re-incarcerated on due process

and *ex post facto* Constitutional grounds. We have generally followed the principle, however, that " 'we will not reach a constitutional issue when a case can properly be disposed of on a non-constitutional ground.' " *Professional Nurses v. Dimensions*, 346 Md. 132, 138, 695 A.2d 158, 161 (1997) (quoting *State v. Lancaster*, 332 Md. 385, 403–04 n. 13, 631 A.2d 453, 463 n. 13 (1993)). We shall follow that principle in this case as well; as there is a valid non-constitutional ground upon which to affirm Judge Kaplan's order, there is no need for us to opine upon the Constitutional issues.

■ The sole basis of the Division's recalculation of Henderson's good conduct credits was the language we used in *Wickes*, quoted above, enunciating the view that, whenever an inmate is released on mandatory supervision or parole and commits a new crime, the sentence imposed for that new crime may not be aggregated with the sentence imposed earlier, to form one term of confinement. That, and that alone, is what led the Division to redetermine the mandatory supervision release dates of some 2,000 inmates. That recalculation, we now learn, affects inmates in different ways.

As we indicated above, the expanded "holding" in *Wickes*, precluding the Division from applying § 700 as it is written whenever an inmate receives a new sentence for conduct occurring while on mandatory supervision, was not necessary in order to reach the result in *Wickes*. Apart from the significant administrative problems it has caused for the Division, which we perhaps dismissed too quickly, that expanded language actually conflicts with the statutory direction in § 700 and has led to a result directly contrary to what was intended in *Fields* and *Wickes*. The predominant reasoning in both cases was that, through the enactment of Ch. 588 in 1992, the General Assembly directed that inmates be allowed ten days a month good conduct credit against sentences imposed on or after October 1, 1992 for non-violent, non-drug offenses, and that, to the extent that the device of a single term of confinement would frustrate that direction, an ambiguity was created—an ambiguity that the rule of lenity required be

resolved in favor of the inmate.[2]   That reasoning fully justified the holdings in both cases.   All that we said in *Fields*, and all that we needed to say in *Wickes*, was that all sentences that overlap or run consecutively do not need to aggregate "*for all purposes* to a single term of confinement."   (Emphasis added.)

Aggregation was rejected in those cases because it denied the inmates a legislatively mandated benefit.   Rejection in this case would have the opposite effect.   Section 700(d)(1) states specifically that the good conduct credit is to be deducted in advance "from the inmate's term of confinement," and § 700(a)(2) defines precisely how a "term of confinement" is to be calculated when the inmate is serving multiple sentences. Application of the statutory direction to aggregate the sentences produces no ambiguity in this instance; it does not deprive Mr. Henderson or others similarly situated of any legislatively created benefit.   In short, his release in July, 1997 was not in contravention of the law but in full accord with it.   The Division calculated his good time credits exactly as it should have and properly released him.   The error, understandable in light of the noted language used in *Wickes*, was in recalculating his credits so as to deprive him of the liberty to which he was statutorily entitled.   Quite apart from whether the Division unconstitutionally applied some new principle of law retroactively, as Judge Kaplan held, Henderson's reincarceration was unlawful because it was not authorized by statute, and he was entitled to be released for that reason.[3]

---

**2.**   As Judge Chasanow so cogently pointed out in *Fields*, rigid adherence to a single term of confinement approach in the context presented would produce the absurdity of a term of confinement imposed both before and after October 1, 1992. *Fields*, 348 Md. at 266, 703 A.2d at 178.

**3.**   In his dissenting and concurring opinion, Judge Chasanow claims that we have overlooked the effect of § 700(k), which provides that, when an inmate is sentenced to imprisonment for a crime committed while on parole and the parole is revoked, the diminution of credits allowed prior to the inmate's release on parole may not be applied toward the inmate's term of confinement upon return to the Division of Correction.   We have not overlooked § 700(k).   That subsection was not enacted until 1996; it took effect October 1 of that year.   The

These three cases—*Fields, Wickes,* and *Henderson*—illustrate the different ways in which a statute such as Ch. 588 can affect inmates in our correctional system. In *Fields* and *Wickes,* we were dealing with one context and did not need, or really intend, to go beyond it. In articulating a secondary justification for our holding in *Wickes,* we inadvertently led the Division to a conclusion that was both unintended and erroneous. *Fields* and *Wickes* remain good law, based on the ambiguity created in the circumstances of those cases and its resolution through application of the rule of lenity. That rule does not require a departure from the statutory direction in § 700 when, as here, there is no ambiguity.

ORDER AFFIRMED; APPELLANTS TO PAY THE COSTS.

CHASANOW, Judge, concurring and dissenting.

I cannot join the majority opinion for several reasons. First, a majority of the Court acknowledges they joined in but at the time did not realize the implications of two of this Court's opinions: *Md. House of Correction v. Fields,* 348 Md. 245, 703 A.2d 167 (1997), and *Beshears v. Wickes,* 349 Md. 1, 706 A.2d 608 (1998). Those same members of the Court endorsed the clarification of the method of calculating good-conduct credits for inmates released on parole or mandatory release (hereinafter referred to collectively as "parole") because it was more beneficial than the prior method to inmates who recidivate by committing non-violent crimes. Now, however, they decline to follow the same method of calculation because it is less beneficial than the disapproved method of calculating good-conduct credits for inmates who recidivate and commit violent crimes and serious drug distribution

conviction, sentence, and parole revocation that led to Henderson's reincarceration occurred in 1994. Subsection 700(k) therefore has no application to this case. It will, however, apply to persons on parole who commit new crimes and receive new sentences on or after October 1, 1996 and, subject to any individual defenses that might be raised, will have to be given effect by the Parole Commission and the Division of Correction as to those persons.

crimes (hereinafter I will collectively refer to these crimes as "violent crimes"). It seems to me that the method of calculation described in *Wickes* that lets non-violent offenders out sooner, but also keeps parole-violating violent offenders in longer, is a desirable result. Second, the majority requires two totally different constructions of "term of confinement" as it pertains to sentences for crimes committed while on parole because two different constructions are necessary to assure that both non-violent, as well as violent offenders who commit crimes while on parole, serve the least possible time for their new crimes. Third, had the Parole Commission not exercised its discretion to revoke Henderson's parole when he committed a new crime,[1] Henderson would have been serving only one sentence and would have had a mandatory release date of February 25, 2002, but because the Parole Commission also revoked Henderson's parole, he is serving two sentences and, therefore, according to the majority, his mandatory release date is over 4½ years earlier, July 7, 1997. I doubt that the Parole Commission will be pleased to find out that, by revoking Henderson's parole after his new sentence, it was decreasing, not increasing, the time he would serve and was mandating that he be released 4½ years earlier than if his parole was not revoked. Finally, the majority purports to be construing Maryland Code (1957, 1996 Repl.Vol., 1997 Supp.), Article 27, § 700,[2] but its construction is directly contrary to another section of that same statute not cited by the majority.

The Division of Correction read our two opinions in *Fields* and *Wickes, supra*, and understood both the clearly set forth holding that sentences for crimes committed while out on

---

**1.** Maryland Code (1957, 1997 Repl.Vol., 1997 Supp.), Article 41, § 4–511 provides in pertinent part:

"(c) *Action authorized by member.*—If the Commission member finds, from the evidence, that the parolee has violated a condition of his parole, the Commission member may take the action that he considers appropriate, including:

(1) Revocation of the order of parole."

**2.** Unless otherwise indicated, all statutory references are to Md.Code (1957, 1996 Repl.Vol., 1997 Supp.), Art. 27.

parole were to be treated as new terms of confinement and the implications that these two cases had on the method of calculating good-conduct credits for inmates who commit and are sentenced for crimes committed when they are on parole. We stated quite clearly that a sentence for a crime committed by an inmate while out on parole is a separate sentencing event and a separate term of confinement. We even gave explicit examples of how the calculations were to be made. *Wickes,* 349 Md. at 10–12, 706 A.2d at 612–13. The Division used that new method to recalculate the sentences of Fields, Wickes, Henderson and many other inmates. Non-violent parole violators benefited from the new method of calculation while violent parole violators faired worse under the new method of calculation. Those inmates like Fields and Wickes, who committed and were sentenced for non-violent crimes while out on parole, received good-conduct credits at the rate of ten days per month on their new terms of confinement and new earlier release dates than under the former method, but those inmates like Henderson, who committed violent crimes while out on parole, received only five days per month on their new terms of confinement and could not carry over diminution credits from their prior terms of confinement, resulting in later release dates. The majority now says that a sentence for a crime committed while out on parole is a new term of confinement only for some but not all parole violators. There are no bases in statutory language, law, or logic for holding that the same statute requires a new sentence for a post-parole crime to be a different term of confinement if the sentence is for a non-violent crime, but part of the same term of confinement if the new sentence is for a violent crime.

The majority's opinion is consistent with *Fields* and *Wickes* in its explanation of the history of § 700 and the interpretation of that statute as applied in *Fields* and *Wickes*. The majority strains to manufacture a way to make the *Fields* and *Wickes* decisions inapplicable to recidivists who commit violent crimes on parole in order to let those violent recidivists out earlier than our express language in the *Wickes* decision would allow. I do not believe this inconsistent construction that benefits

violent multiple offenders was the intent of the legislature, and I know it is contrary to the express language of *Wickes* and was neither the intent of the author of the *Fields* and *Wickes* opinions nor at least two additional members of the Court.

The majority holds that, when an inmate is released on parole and commits a new and nonviolent crime, the *Fields* and *Wickes* decisions are applicable and the second sentence commences a new term of confinement, but when the parolee commits a violent crime *Fields* and *Wickes* are not applicable and the second sentence is not a new term of confinement. What is the rationale for this dual construction of the same statute? That, if we apply *Fields* and *Wickes* to those who commit violent offenses while on release, they will serve more time than they would have served under the prior disapproved construction. Either a new sentence for a crime committed while on parole is a new term of confinement or is not a new term of confinement. The *Fields* and *Wickes* construction of "term of confinement" should apply to all inmates, not just those whose new crimes were nonviolent. There is no basis for the novel approach of giving the same statute and the same issue of whether post-parole sentencings are part of the same or different terms of confinement two different interpretations.

When Henderson was released on parole in 1991, he committed another crime, a drug distribution offense, which is one of those crimes the statute classifies along with violent crimes and that I have collectively called violent crimes. That sentence was in 1994. He received ten years for that new offense, consecutive to the sentences he was serving prior to his parole. Under *Fields* and *Wickes* this is a new term of confinement. The new ten-year term of confinement was for a violent offense, so Henderson could only receive five days per month good-conduct credits or 600 days, which meant that he would not be eligible for parole until February 25, 2002. That is the way we said good-conduct credits should be calculated in *Fields* and *Wickes* since the new sentence was a new term of confinement. The actual reason why the old disapproved method of calculation gives Henderson a 4½ year earlier

release date of July 7, 1997, is because if there is only a single term of confinement encompassing both sentences, then the effect is that some of the diminution credits Henderson earned on his pre-parole sentence are credited to reduce his new post-parole sentence. According to the majority, instead of getting the five days per month or 600 days of diminution credits (less than two years) on the drug distribution offense he committed while on parole, Henderson actually receives well over 2,000 days of diminution credits (over 6½ years according to the majority) on that new sentence because he gets additional use of the pre-parole diminution credits to reduce his post-parole sentence. In effect, while Henderson was in prison and on parole he was earning 4½ years diminution credits that could be applied to a post-parole crime he had not yet committed.

Inmates should not have a kind of savings account where they can bank sentencing diminution credits to be used to reduce the time they will be sentenced to for future crimes they will commit when they are released from prison on parole. Henderson should not be able to store up over 4½ years of diminution credits earned before and during his parole and apply them to a sentence for a crime he committed *after* he was paroled. I thought it was only in the game of Monopoly that one could acquire in advance a "get out of jail free" card.

Finally, and perhaps most importantly, the majority dismisses the fact that, within the same statute the Court is construing, the legislature made clear its disapproval of what the majority is doing by letting Henderson's pre-parole diminution credits reduce his post-parole sentence. The same statute that the majority is construing states that an inmate who is released on parole or mandatory supervision and who commits and is sentenced for a crime while released should *not* receive carried over credit for pre-parole diminution credits on the new post-parole sentence. Thus, the majority's construction of § 700(k) is not only contrary to the express language in *Fields* and *Wickes,* it is contrary to the express language of § 700(k). Section 700(k) provides in pertinent part:

*"Effect of parole violation on deductions.*—(1) Except as provided in paragraph (2) of this subsection, if an inmate is convicted and sentenced to imprisonment for a crime committed while on parole and the parole is revoked, diminution credits that were allowed prior to the inmate's release on parole may not be applied toward the inmate's term of confinement upon return to the Division of Correction. (2) Paragraph (1) of this subsection does not apply to any diminution credits earned following the inmate's return to the Division of Correction."

That statute, which went into effect in 1996, makes clear that, if a parolee commits and is sentenced for a new crime, the parolee cannot use diminution credits earned before parole to reduce the sentence for the crime committed while on parole. The wisdom of telling parolees they cannot store up diminution credits from their pre-parole sentences (in Henderson's case over 4½ years) to be applied to reduce future sentences for new crimes they may commit while out on parole seems obvious. That section shows that the legislature did not intend § 700(k) to be construed as the majority construes it. The only reason why Henderson gets out in just over three years on a ten-year sentence for a crime he committed while out on parole is that the majority applies an additional 4½ years diminution credits from the sentence Henderson was serving prior to his release on parole in addition to the 600 days of good-conduct credits Henderson is entitled to as credit on the sentence for his post-parole violent crime. In clear contradiction to the legislative intent indicated in § 700(k), Henderson is allowed diminution credits earned prior to release on parole to reduce the sentence for a crime he later committed while on parole. Members of the Court may be free to ignore or disavow clear language they adopted in prior decisions, but they are not free to ignore or disavow clear legislative intent when construing a statute. At least the majority does recognize that after 1996, if a parolee like Henderson commits and is sentenced for a new crime, that post-parole sentence will constitute a new term of confinement. Thus, according to the majority, the 1992 good-conduct

credit statute is to be construed as follows: If a parolee commits and is sentenced for a nonviolent crime after being released on parole, the new sentence and old sentence are separate terms of confinement. If a parolee commits and is sentenced for a violent crime while on parole before 1996, according to the majority, the legislature intended violent parole violators to carry over good-conduct credits from pre-parole sentences, and the pre-parole and post-parole sentences are one term of confinement, but after 1996, all parolees who commit crimes are treated the same and the pre-parole sentence and post-parole sentence are different terms of confinement. I sincerely doubt that is what the legislature intended. I respectfully dissent from the Court's opinion, but concur in the result, albeit, for a different reason.

Henderson was released by the Division of Correction on mandatory release. At the time of his release, both the Division of Correction and Henderson believed he was entitled to mandatory release under the applicable statutes. Ten months later, as a result of our *Fields* and *Wickes* decisions, the Division of Correction came to the conclusion that Henderson was not entitled to mandatory release and determined to terminate Henderson's release. Based on an arrest warrant issued without any semblance of probable cause, Henderson was deprived of his liberty and reincarcerated by the Division of Correction without any prior notice and without being given any opportunity to contest the Division's unilateral action. This is improper. *See Morrissey v. Brewer*, 408 U.S. 471, 92 S.Ct. 2593, 33 L.Ed.2d 484 (1972).

The Division had two options and neither of them was entirely satisfactory, but I believe the one chosen was improper. The Division could have, and I believe should have, sought revocation of Henderson's mandatory release under one or more of the administrative hearing provisions: Md.Code (1957, 1997 Repl.Vol., 1997 Supp.), Art. 41, § 4–612(2)(c) (person under mandatory supervision is subject to rules and conditions applicable to parolees); § 4–612(e)(revocation of mandatory supervision); § 4–511B (modification of parole); and § 4–511 (revocation of parole). These procedures would

provide Henderson with an opportunity to be heard as to why his mandatory release should not be terminated and perhaps to even argue for continuation of parole or home detention. Instead, the Division chose to treat its release of Henderson as a nullity and caused an escape warrant to issue for Henderson's arrest. Although an escape warrant might have been proper if Henderson knew or even had some reason to suspect that his release was improper, that was not the situation in the instant case. At the time of Henderson's release, all parties believed the release was required. Henderson had done nothing that justified an escape charge. There is absolutely no probable cause for the escape warrant and no justification for using a baseless charge as a subterfuge to reacquire custody of a parolee instead of using the administrative procedure for a revocation of mandatory release which provides for a hearing for the parolee. Henderson is entitled to habeas corpus relief as a result of the improper procedure that returned him to prison.

Chief Judge BELL and Judge RODOWSKY have authorized me to state that they join in the views expressed in this concurring and dissenting opinion.