780 A.2d 1199

**Ramarro Lee SMITH,**

**v.**

**STATE of Maryland.**

**No. 1879, Sept. Term, 2000.**

Court of Special Appeals of Maryland.

Sept. 10, 2001.

Ramarro L. Smith, Jessup, for appellant.

Karl A. Pothier, Assistant Attorney General (J. Joseph Curran, Jr., Attorney General, on the brief), Baltimore, for appellee.

Submitted before MURPHY, C.J., HOLLANDER, and ADKINS, JJ.

ADKINS, Judge.

In this appeal, we review another dispute regarding an inmate's eligibility for diminution credits—this time for "special project" credits. The Secretary of the Maryland Department of Public Safety and Correctional Services (the "Secretary"), and the Commissioner (the "Commissioner") of the Division of Correction (collectively, the "DOC") have denied appellant Ramarro Lee Smith, an inmate in DOC custody, "special project" credits that he claims he earned during his incarceration by "double celling" (*i.e.*, being confined in a cell

with another inmate). The Circuit Court for Baltimore City denied Smith's Petition for Writ of Habeas Corpus, without stating its reasons for doing so.[1] This Court granted Smith's application for leave to appeal. He presents four questions, which collectively ask whether the hearing court erred in denying appellant's Petition for Writ of Habeas Corpus. We conclude that it did, reverse the judgment, and remand for a determination of whether appellant is entitled to double celling credits and, consequently, to an earlier mandatory release date.

## FACTS AND LEGAL PROCEEDINGS

On September 17, 1982, the Circuit Court for Montgomery County sentenced Smith to thirty years incarceration for second degree murder (the "murder sentence"). This sentence began on June 10, 1977. The DOC calculated the maximum expiration date for the murder sentence to be June 10, 2007. *See* COMAR 12.02.06.01B(9) ("Maximum expiration date" is defined as "the date computed by adding an inmate's total sentence length to the beginning date of the first sentence with the earliest start date which is part of the inmate's then current term of confinement").

On January 5, 1989, Smith was paroled. Approximately ten months later, on November 3, 1989, the Maryland Parole Commission issued a parole violation warrant, alleging that it had reasonable cause to believe that Smith had violated the conditions of his parole. At a parole violation/revocation hearing on March 7, 1990, Smith's parole was revoked. By that time, Smith had been on parole for 373 days. The parole commissioner allowed him street time credit for a portion of that time—nine months, or 273 days. *See* Md.Code (1999), § 7–401(d)(1) of the Correctional Services Article[2] (upon revo-

---

1. This was error. *See* Md. Rule 15–311 ("The judge to whom the petition is made or referred shall dictate into the record or prepare and file a memorandum setting forth ... the reasons for the action taken").

2. Unless otherwise noted, all statutory references are to the Correctional Services Article of the Maryland Code (1999).

cation of parole, "the inmate shall serve the remainder of the sentence originally imposed unless the commissioner hearing the parole revocation, in the commissioner's discretion, grants credit for time between release on parole and revocation of parole"). On January 13, 1990, Smith was returned to the DOC, which recalculated his maximum term of confinement date to be September 18, 2007.

Following Smith's return to the DOC, he was convicted of a robbery he committed while he was on parole. On May 29, 1990, the Circuit Court for Baltimore County sentenced him to a five-year term (the "robbery sentence"), to be served consecutively to the murder sentence. As a result, the DOC revised Smith's confinement date to September 18, 2012.

During his incarceration, Smith has earned good conduct, special project, and industrial credits. At some unknown point during his incarceration, Smith began to double cell.[3] The DOC declined to give Smith any special project credits for double celling.

## DISCUSSION

### I.

#### Diminution Credits

We begin with a review of diminution credits. "Diminution credits can be earned by inmates to reduce the lengths of their confinements." *Frost v. State*, 336 Md. 125, 128, 647 A.2d 106 (1994). Inmates may earn good conduct credits, work or industrial credits, education credits, and special project credits. *See* §§ 3–702 to 3–707. Generally, an inmate may earn up to five credits in each category per month. *Id.* In the case of special project credits, however, an inmate may earn up to ten credits each month. The maximum number of

---

3. The record contains no indication when appellant began to double cell. In his brief, appellant alleges that he has been double celling since 1992. The State does not allege that this is incorrect.

diminution credits that an inmate may earn monthly is capped at 20 days. *See* § 3–708.

The special project credits at issue in this appeal can be earned only "in those special selected work projects or other special programs designated by the Commissioner and approved by the Secretary." § 3–707(a). Under DOC regulations, inmates may earn diminution credits for participating in "special projects" established by the Commissioner and Secretary. The DOC regulations state that an inmate who is double celled, and who otherwise "meets the eligibility criteria" established for these credits, "is in a special project...." COMAR 12.02.06.05N(1). There are, however, some specific exclusions that make certain inmates ineligible for double celling credits. These exclusions cover, *inter alia,* "an inmate who is serving a ... [s]entence for murder...." *Id.* Thus, an inmate may earn double celling credits only for certain "eligible" sentences.

By earning diminution credits, an inmate may earn the right to be released on a date much earlier than that designated by his or her original term of confinement. *See Frost,* 336 Md. at 128, 647 A.2d 106. "Upon accumulating sufficient credits to earn entitlement to release, the inmate is deemed released under '[m]andatory supervision.' " *Id.* Mandatory supervision is "a conditional release from confinement" granted to an inmate who "has served the term or terms, less diminution credit awarded...." § 7–501(3).

We turn now to Smith's complaint that he has earned double celling credits that the DOC has refused to award him.

## II.

### Appellant's Eligibility For Double Celling Credits

Smith contends that the hearing court erred by failing to order the DOC to award him special project credits for double celling during his robbery sentence. He claims that his 30 year murder sentence "reached and exceeded its 'Mandatory Supervision Release' date in approximately February/March

of 1998, based upon the diminution credit days earned up to that time." Since that time, Smith complains, he has been serving his consecutive five-year robbery sentence without collecting any diminution credits for double celling.

The DOC counters that Smith is not eligible for double celling credits because "[he] is serving a term of confinement that includes a sentence for second degree murder," which is an ineligible sentence under the regulations. The DOC posits that applying credits against an inmate's sentence, rather than against the inmate's entire term of confinement, conflicts with section 3–702, which provides that inmates may be "entitled to a diminution of [their] *term of confinement,*" rather than a diminution of their "sentence." (Emphasis added.) It argues that Smith's "suggestion that the DOC· should apply allowed diminution of confinement credits to individual sentences contained within his term of confinement rather than to the term itself is proscribed" by section 3–702.

The question we must decide, then, is whether an inmate may be eligible for double celling credits when his single "term of confinement" encompasses multiple, consecutive sentences, one of which the DOC has defined as an "ineligible" sentence and the other an "eligible" sentence. If, as the DOC argues, double celling credits are not available during any term of confinement that includes a sentence for murder (or, presumably, for any other ineligible sentence), then Smith is not entitled to any credits. If, as Smith argues, double celling credits may be available for that portion of a term of confinement representing the inmate's consecutive "eligible" sentence, then he may be entitled to double celling credits.

We begin by reviewing the statutes and regulations governing the double celling credits at issue here. The legislature mandated in section 3–702 that "an inmate committed to the custody of the Commissioner [of Correction] is entitled to a diminution of the inmate's term of confinement as provided under this subtitle." "Term of confinement" is defined as:

(1) the length of the sentence, for a single sentence; or

(2) the period from the first day of the sentence that begins first through the last day of the sentence that ends last, for:

(i) concurrent sentences;

(ii) partially concurrent sentences;

(iii) consecutive sentences; or

(iv) a combination of concurrent and consecutive sentences.

§ 3–701.

Special project credits are authorized under section 3–707, which states in relevant part:

In addition to any other deductions allowed under this subtitle, an inmate may be allowed a deduction of up to 10 days from the inmate's term of confinement for each calendar month during which the inmate manifests satisfactory progress in those special selected work projects or other special programs designated by the Commissioner and approved by the Secretary.

The Secretary and Commissioner have designated double celling as a special project, by adopting regulations providing that a double celled inmate serving what we shall refer to as an "eligible" sentence "is in a special project."

N. Special Project Credit for a Double Celled Inmate.

(1) An inmate who meets the eligibility criteria in § N(2), below, is in a special project pursuant to [section 3–707], except an inmate who is serving a:

(a) Sentence for murder, rape, sex offenses, child abuse, drug trafficking or distribution, or use of a firearm in the commission of a felony;

(b) Mandatory sentence for the commission of a felony; or

(c) Sentence as a repeat offender under Article 27, § 643B, Annotated Code of Maryland.

(2) An inmate eligible for special project credits under this section is an inmate who:

(a) Has agreed to be voluntarily double-celled;

(b) Is double-celled in an institution which is required by court order to be single-celled, or by court order has a population cap and the population cap is exceeded;

(c) Is double-celled in an institution which is not under court order but where the number of double cells exceeds the single-cell design capacity of the institution; or

(d) Is housed in a dormitory or dormitory-type housing and the housing area where the inmate is confined does not provide for 55 square feet of living space per inmate exclusive of dayrooms, toilets, and showers.

(3) An inmate who meets the criteria described above shall receive 5 days credit for each calendar month, and on a prorated basis for any portion of a calendar month, beginning on a date and ending on a date the Secretary determines appropriate, based on the demand for inmate housing and services in the Division of Correction.

\* \* \*

(7) This regulation may not be interpreted, understood, or construed to mean that an inmate who is eligible to receive the credits described in it has a right to these credits or that an inmate will continue to receive these credits in the future.

COMAR 12.02.06.05N.

■ In construing and applying these statutes and the DOC regulation, this Court generally gives the DOC's interpretation considerable weight. A "court's task on review is *not* to 'substitute its judgment for the expertise of those persons who constitute the administrative agency[.]' " *United Parcel Svc. v. People's Counsel for Baltimore County,* 336 Md. 569, 576–77, 650 A.2d 226 (1994) (citations omitted). Moreover, appellate courts are mindful that "an administrative agency's interpretation and application of the statute which the agency administers should ordinarily be given considerable weight by reviewing courts. Furthermore, the expertise of the agency in its own field should be respected." *Board of Physician Quality Assur. v. Banks,* 354 Md. 59, 69, 729 A.2d 376 (1999) (citations and footnote omitted). The same principles apply to

an agency's interpretation of its own regulation. *See, e.g., Changing Point, Inc. v. Maryland Health Res. Planning Comm'n,* 87 Md.App. 150, 160, 589 A.2d 502 (1991) ("[A]n agency is best able to discern its intent in promulgating a regulation. Thus, an agency's interpretation of the meaning and intent of its own regulation is entitled to deference").

■■■■ This is not to say, however, that the DOC's interpretation and application of its own regulation is conclusive. Courts will not permit an agency to violate the plain language of its regulation.

> It is well established that rules and regulations promulgated by an administrative agency [such as the DOC] cannot be waived, suspended or disregarded in a particular case as long as such rules and regulations remain in force. This rule has been recognized in federal and state jurisdictions and has become known as the "Accardi doctrine" since it was announced in *U.S. ex rel Accardi v. Shaughnessy,* 347 U.S. 260, [74 S.Ct. 499, 98 L.Ed. 681] (1954).... This doctrine has been broadly applied.... "An agency of the government must scrupulously observe rules, regulations or procedures which it has established. When it fails to do so, its action cannot stand and courts will strike it down." ... [T]here is an abundance of authority for the doctrine that an agency cannot violate its own rules and regulations....

*Hopkins v. Maryland Inmate Grievance Comm'n,* 40 Md.App. 329, 335–36, 391 A.2d 1213 (1978) (quoting *United States v. Heffner,* 420 F.2d 809, 811 (4th Cir.1970)) (other citations omitted). *See also* IV–13 *Administrative Law* § 13.03 (Matthew Bender 2000) ("Properly promulgated regulations have the force of law, binding the agency as well as other affected persons.... [C]ourts have not allowed agencies to violate any rules and regulations that were promulgated to benefit a party ... by entitling him to a substantive benefit").

In this case, we do not find the DOC's interpretations of section 3–702, section 3–707, and the double celling regulation persuasive, because the DOC has ignored the plain language of its own regulation. For the reasons set forth below, we

conclude that Smith is entitled to earn credits against his eligible sentence, even if he could not do so against his ineligible sentence.

 Preliminarily, we acknowledge our agreement with the DOC's contention that it is not obligated to create or maintain a special project for double celling. By providing that inmates "may be allowed" special project credits "for satisfactory progress in ... special programs designated by the Commissioner and approved by the Secretary," the legislature authorized, but did not require, the DOC to "designate" double celling as a "special program" for which an inmate may earn special projects credits. *See* § 3–707. Thus, the DOC has discretionary authority to abolish the double celling program by regulating it out of existence. Similarly, it has authority to alter the program by redefining who is participating in the double celling program—in other words, by changing its own eligibility standards. Moreover, we recognize that not all inmates who are eligible for double celling credits will actually retain them. The Legislature explicitly authorizes the DOC to revoke special project credits "[i]f an inmate violates the applicable rules of discipline, ... according to the nature and frequency of the violation." § 3–709(a).

 Where we part company with the DOC is on the issue of whether it may deny double celling credits to inmates who meet the eligibility requirements that the DOC itself established. We find the language of the DOC regulation clear and unambiguous. Other than a requirement that the inmate be double celled in a qualified institution,[4] the only criterion that the DOC selected to identify inmates eligible for double celling credits is the inmate's *sentence:* "An inmate who meets the [double celling] eligibility criteria in § N(2), below, is in a special project pursuant to [section 3–707], *except an inmate who is serving a. .... sentence* for murder [or other specified crimes]; [m]andatory *sentence* for the commission of a felony;

---

4. It is undisputed that appellant satisfied the double celling requirements of the regulation.

or *"[s]entence* as a repeat offender...." COMAR 12.02.06.05(1)(emphasis added). Thus, the eligibility touchstone for double celling credits is the nature of the inmate's sentence. We interpret the regulation to mean that inmates who serve their eligible sentences consecutively to an ineligible sentence may earn double celling credits, but only against the time served under the eligible sentence.

Unlike the DOC, we do not see any conflict between this interpretation of the regulation and sections 3–702 and 3–707. There is a common sense way to read these authorities *in pari materia* to avoid the contradiction posited by the DOC. *See Sec'y of Public Safety and Correctional Svcs. v. Hutchinson*, 359 Md. 320, 328, 753 A.2d 1024 (2000). The regulation defines how double celling credits are earned (*i.e.*, double celling during an eligible sentence), while sections 3–702 and 3–707 delineate how the credits are applied (applying those credits against the eligible sentence, in order to reduce an inmate's term of confinement). Once an inmate like Smith finishes his ineligible sentence and begins his consecutive eligible sentence, he may become eligible for double celling credits. Thus, the credits still would be applied to Smith's *term of confinement*—as sections 3–702 and 3–707 contemplate—but he would only earn credits for the time he has been serving his eligible robbery *sentence*—as the regulation contemplates.

We find support for our interpretation in *Hutchinson*, 359 Md. at 330–31, 753 A.2d 1024; *Sec'y, Dep't of Pub. Safety & Corr. Svcs. v. Henderson*, 351 Md. 438, 718 A.2d 1150 (1998); *Beshears v. Wickes*, 349 Md. 1, 706 A.2d 608 (1998); and *Maryland House of Corr. v. Fields*, 348 Md. 245, 703 A.2d 167 (1997). In these cases, the Court of Appeals construed the statute governing "good conduct" credits, which mandated a deduction of 10 good conduct credits per month for inmates who had been sentenced to a term of confinement after a specific date and who were not serving terms of confinement for crimes of violence or certain drug related offenses. *See* § 3–704. These cases are instructive because they considered the eligibility of inmates for diminution credits based, in part,

on the term of confinement the inmate was then serving. In all of these cases, the Court of Appeals concluded that good conduct credits could not be granted or denied merely because an inmate was serving a single term of confinement for multiple sentences, only some of which were ineligible for diminution credits.

In *Fields,* the Court awarded habeas relief to an inmate whose term of confinement resulted from aggregating a sentence imposed after the monthly rate of good conduct credits increased from 5 days to 10 days, with a sentence imposed before that rate increase took effect. The Court rejected the DOC's argument that if any part of the inmate's term of confinement consisted of a sentence imposed before the rate increase took effect, then the inmate was not entitled to any good conduct credits at the higher rate. It reasoned that the DOC's "strict application of the concept and definition of 'term of confinement' . . . . would preclude inmates . . . who received a [sentence eligible for credits at the higher rate] from receiving the benefit of the additional five days a month for that new sentence." *Henderson,* 351 Md. at 443, 718 A.2d 1150 (summarizing rationale in *Fields* ). Instead, it concluded that "it would be impossible to say that a single 'term of confinement' was imposed either before or after [the date of the rate change] because, in fact, the 'term of confinement was imposed both before *and* after that date.' " *Id.* at 444, 718 A.2d 1150 (quoting *Fields,* 348 Md. at 266, 703 A.2d 167). This ambiguity regarding the scope and application of the inmate's term of confinement "led [the Court] to invoke the rule of lenity, requiring that the ambiguity be construed 'against the state and in favor of the [inmate].' " *Id.* at 444, 718 A.2d 1150 (quoting *Fields,* 348 Md. at 267, 703 A.2d 167).

In *Wickes,* the Court applied the *Fields* holding and reasoning to an inmate whose term of confinement resulted from sentences for both a violent crime that was ineligible for good conduct credits, and a nonviolent crime that was eligible for such credits. The DOC's reason for refusing to give the inmate the higher rate of good conduct credits against his eligible sentence was that his term of confinement included a

sentence for a violent crime that was ineligible for the higher rate. The Court of Appeals held that despite the inmate's single term of confinement, the DOC could not aggregate the two sentences in order to determine that the inmate was ineligible for good conduct credits. *See Wickes,* 349 Md. at 9, 706 A.2d 608. It reasoned that using "the device of a single term of confinement" as the basis for denying credits for both sentences "would frustrate" the legislature's direction that inmates serving sentences eligible for good conduct credits are entitled to those credits. *Henderson,* 351 Md. at 445, 451–52, 718 A.2d 1150 (summarizing holding and rationale in *Wickes* ).

In *Henderson,* the Court addressed certain problems that resulted from what it characterized as some unnecessary and misleading dictum in *Wickes. Henderson,* 351 Md. at 451–53, 718 A.2d 1150. Nevertheless, the *Henderson* court confirmed a principle common to each of these cases: "all sentences that overlap or run consecutively do not need to aggregate *'for all purposes* to a single term of confinement.' " [5] *Id.* at 452, 718 A.2d 1150 (emphasis in original).

The Court most recently considered diminution credits in *Hutchinson,* 359 Md. 320, 753 A.2d 1024. Hutchinson committed a new crime while he was released on mandatory supervision, and was returned to prison to serve the remaining part of his original sentence, plus a partially overlapping sentence for the new crime. The Court held that he was entitled to good conduct credits only against the new sentence. In doing so, it rejected the DOC's argument that Hutchinson was not entitled to earn any good conduct credits against the new sentence because the legislature mandated that "an inmate may not be awarded any new diminution credits after the inmate's mandatory supervision has been revoked." § 7–504(b). The *Hutchinson* Court held the DOC may not deprive an inmate of credits against his new, eligible sentence merely

---

5. Based on this reasoning, the Maryland Attorney General advised the DOC to calculate good conduct credits separately for eligible and ineligible sentences. *See* Md. Att'y Gen. Op. No. 99–002, at 24 (Feb. 16, 1999).

because his term of confinement included a sentence that was ineligible for those credits. *Hutchinson*, 359 Md. at 331, 753 A.2d 1024. It also rejected the inmate's argument that any credits he earned against his new sentence should be applied to reduce his entire term of confinement rather than the length of time he would serve under the new sentence. Applying a "common sense" interpretation of the statute consistent with its prior decisions, the Court concluded that the inmates earned good conduct credits against the term of the new, eligible sentence, not against the term of confinement. *See id.* at 330–31, 753 A.2d 1024. In doing so, it recognized that inmates "are also eligible for work, education, and special project credits against that sentence," but that "[t]hose credits apply only to the new [eligible] sentence(s), however." *Id.* at 331, 753 A.2d 1024.

Together, these cases demonstrate that the Court of Appeals already has considered and rejected attempts to narrow eligibility for diminution credits by using the "term of confinement" concept to deny an inmate credits against a sentence that is eligible for them. In all of these cases, certain of the sentences at issue were "eligible" for diminution credits, while others were "ineligible." Indeed, the *Wickes* Court was called upon to answer a question analogous to the issue presented by this case—whether the eligible and ineligible sentences that comprised the inmate's single term of confinement should be aggregated so that he would not be able to earn credits he could have earned if his entire term of confinement had consisted solely of eligible sentences. The answer in *Wickes* was "no"—that the eligible and ineligible sentences should be separated for purposes of determining the credits, that inmates whose term of confinement consists of both ineligible and eligible sentences may earn credits against the eligible sentence, and that their terms of confinement must be calculated by applying such credits against the eligible sentence. In *Hutchinson*, the Court indicated in dictum that special project credits should be determined in the same way.

We found no other authority addressing the issue presented by this case—whether the "separate consideration"

rule for determining good conduct credits also applies to the determination of special project credits. We find the Court of Appeals' "commonsensical" rationale for separately considering eligible and ineligible sentences equally applicable to cases involving special project credits. *See Fields,* 348 Md. at 265, 703 A.2d 167. Following the rule that governs good conduct credits, we hold that when an inmate's term of confinement includes both a sentence that is not eligible for the special project credits in question and a consecutive sentence that is eligible for those credits, the two sentences must be considered separately, so that the inmate may reduce his or her term of confinement by earning special project credits against the eligible sentence.

We do not agree with the DOC that the rule governing interpretation of special project credits should be different from the rules governing good conduct credits. In a footnote, the DOC attempts to distinguish the Court of Appeals' decisions in these good conduct cases on the grounds that they only prohibit aggregating sentences to deprive an inmate of a legislatively created benefit like good conduct credits, and do not proscribe aggregating sentences to deprive an inmate of the double celling credits created by the DOC. We are not persuaded by the DOC's distinction between special project credits and good conduct credits.

The fact that special project credits are legislatively authorized, but not mandated, does not justify the DOC's denial of special project credits. We think the DOC has missed the broader lesson of these "good conduct" cases—that diminution credits, once they are created, should be earned and calculated against the eligible sentence of an inmate rather than against his or her entire term of confinement. The DOC established double celling as a special project under the authority of section 3–707. Once the special program was created and defined in accordance with section 3–707, it became a legislatively created benefit, albeit one accomplished through the Secretary and Commissioner. Exercising the discretionary authority given by the legislature, the Secretary and Commis-

sioner selected eligibility standards for earning double celling credits, and then promulgated a regulation adopting those standards in order to confer the benefit of double celling credits on inmates. At that point DOC was bound by its regulation. *See Hopkins,* 40 Md.App. at 336, 391 A.2d 1213.

The DOC is now obligated to honor and follow the regulation as it is written. If an inmate serving an eligible sentence qualifies for double celling credits, then the inmate may not be denied those credits. The DOC may not enact the regulation and then ignore an inmate who falls within its ambit. *See, e.g., id.* at 336–37, 391 A.2d 1213 (reversing order sentencing inmate to isolated confinement, because DOC violated its own rules governing such sentencing, which "confer[red] important procedural benefits and safeguards").

We are not persuaded otherwise by language in subsection (7) of the DOC regulation that "[t]his regulation may not be interpreted, understood, or construed to mean that an inmate who is eligible to receive the credits described in it has a right to these credits or that an inmate will continue to receive these credits in the future." COMAR 12.10.06.05N(7). We do not read this language as reserving unlimited authority in the DOC. As we have discussed, the DOC does not have complete discretion to deny double celling credits to inmates who clearly meet the eligibility standards in the regulation. Accordingly, we shall not construe this language as an attempt to confer on the DOC impermissible authority to exercise its power and discretion in an arbitrary manner that conflicts with its own regulation.

Instead, we view this language as a forthright reminder that the Secretary and Commissioner have authority to abolish, to revoke, or to revise the eligibility standards for double celling credits. Under section 3–707, they may determine whether any special project credits are available, what projects earn such credits, how many credits may be earned, and who may earn them. Subsection (7) does not expand, but merely reserves this authority.

We shall remand this case to the hearing court to determine whether Smith is eligible for any double celling

credits for time served on his robbery sentence, and if so, to adjust his term of confinement and mandatory release date accordingly. Smith's term of confinement must be separated into his two different sentences, so that he might receive the benefit of any special project credits he may have earned for double celling while serving his robbery sentence. Smith claims that he has finished serving his murder sentence. The DOC does not dispute this claim. As of September 18, 2000, when the State filed its response to appellant's habeas petition, the DOC had awarded appellant 3968 credits and determined that his mandatory supervision release date was November 7, 2001. This calculation was made without considering any special project credits that Smith may have earned for double celling. The hearing court must determine (1) the date Smith finished serving his murder sentence, (2) whether he earned and retained special project credits for the time he double celled thereafter, and (3) the adjusted date of his mandatory release after taking into account any double celling credits he may have earned.

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY TO DETERMINE APPELLANT'S ELIGIBILITY FOR SPECIAL PROJECT CREDITS IN ACCORDANCE WITH THIS OPINION. COSTS TO BE PAID BY APPELLEE.**