833 A.2d 33

J. Michael STOUFFER, Warden

v.

Andre STATON.

No. 1582, Sept. Term, 2002.

Court of Special Appeals of Maryland.

Oct. 3, 2003.

Karl A. Pothier, Asst. Atty. Gen. (J. Joseph Curran, Jr., Atty. Gen., on brief), for appellant.

Joseph B. Tetrault (David C. Wright, Stephen Z. Meehan, Pauline K. White, on brief), Chestertown, for appellee.

Argued before ADKINS, SHARER, JAMES S. GETTY, (Retired, Specially Assigned), JJ.

ADKINS, J.

This is another chapter in the "arcane" and evolving book of sentence aggregation disputes that have arisen since the Gen-

eral Assembly created two different accrual rates for good conduct credits.[1] As a general rule, for non-violent and non-drug crimes committed after July 1, 1992, sentences accrue good conduct credits at the rate of ten per month; but sentences for certain violent and drug crimes accrue such credits at half that rate—only five per month. *See* Md.Code (1999, 2002 Cum.Supp.), § 3–704(b) of the Correctional Services Article.

In this episode, the Maryland Parole Commission revoked appellee Andre Staton's mandatory supervision because he committed a violent crime, and Staton returned to prison to serve the remainder of his original sentences, along with a sentence for the new crime. The question we must answer is: what effect did revocation have on the good conduct credits that Staton accrued before he was released on mandatory supervision?[2]

We know what the answer would be if Staton's mandatory supervision had been revoked after June 1, 2002, because the legislature recently enacted new provisions in the mandatory supervision subtitle of the Correctional Services Article ("CS"). As of June 1, 2002, such inmates may not use these "past" good conduct credits (*i.e.*, credits that they accrued before being released on mandatory supervision) to reduce the

---

1. *See, e.g., Sec'y of Pub. Safety & Corr. Servs. v. Hutchinson*, 359 Md. 320, 321, 753 A.2d 1024 (2000)("We explore once again the arcane world of diminution credits available to prisoners in the State correctional system"); *see Moats v. Scott*, 358 Md. 593, 751 A.2d 462 (2000); *Sec'y Dep't of Pub. Safety & Corr. Servs. v. Henderson*, 351 Md. 438, 718 A.2d 1150 (1998); *Beshears v. Wickes*, 349 Md. 1, 706 A.2d 608 (1998); *Md. House of Corr. v. Fields*, 348 Md. 245, 703 A.2d 167 (1997); *Frost v. State*, 336 Md. 125, 647 A.2d 106 (1994); *Witherspoon v. Md. Parole Comm'n*, 149 Md.App. 101, 814 A.2d 123 (2002); *Geddings v. Filbert*, 144 Md.App. 95, 796 A.2d 834 (2002), *cert. denied*, 374 Md. 84, 821 A.2d 371 (2003); *Hillard v. State*, 141 Md.App. 199, 784 A.2d 1134 (2001); *Smith v. State*, 140 Md.App. 445, 780 A.2d 1199 (2001).

2. "When, through the application of [diminution] credits earned, [an] inmate served his or her effective sentence, the inmate [is] released on what is known as mandatory supervision." *Henderson*, 351 Md. at 441, 718 A.2d 1150; *see* Md.Code (1999, 2002 Cum.Supp.), § 7–501 of the Correctional Services Article ("CS").

sentence they were serving on mandatory supervision. *See* CS § 7–502(c); § 7–504(c); 2002 Md. Laws, chs. 485, 486.

But the answer is not so clear in Staton's case, because his mandatory supervision was revoked in 1996. We shall hold that the statutory scheme in effect when Staton's mandatory supervision was revoked created ambiguities that must be resolved in Staton's favor under the rule of lenity.

## FACTS AND LEGAL PROCEEDINGS

While serving sentences imposed in 1993 for non-violent crimes that accrued good conduct credits at the rate of ten per month, Staton earned 333 good conduct credits. The Department of Corrections ("DOC") credited Staton with those and other diminution credits. Staton was released on mandatory supervision on April 22, 1995.[3] His maximum expiration date for these sentences at the time of his release was August 16, 1996.

While on mandatory supervision, Staton committed a violent crime—assault with intent to disable.[1] On May 29, 1996, Staton was sentenced to ten years for that new crime, with all but five years suspended. The new sentence was to be served concurrently with Staton's outstanding and unserved sentences, beginning on January 15, 1996.

As a result of Staton's new conviction, the Maryland Parole Commission revoked his mandatory supervision on June 11, 1996, and ordered Staton to serve the remainder of his original sentences. The parole commissioner allowed Staton 180 days of street time credit for the period he was on mandatory supervision and announced that he would "take 100" of Staton's past good conduct credits that he had accrued

---

**3.** Staton was released to a detainer lodged on April 19, 1995, by the Circuit Court for Baltimore City. He was released from physical custody no later than August 1, 1995.

**4.** Assault with intent to disable in violation of Md.Code (1957, 1999 Repl.Vol.), Article 27 section 386 is a crime of violence. *See* Md.Code (2002), § 14–101(a)(6) of the Criminal Law Article.

on the original sentences. The Parole Commission's order did not indicate the number of good conduct credits from which the 100 credits would be subtracted.

On June 19, 1996, the Circuit Court for Baltimore City found that Staton had violated his probation in the cases for which he was originally sentenced. The court executed the previously suspended portion of those sentences, ordering Staton to serve four years and eight months, "consecutive to the last sentence to expire of all outstanding and unserved Maryland sentences."

The DOC recalculated Staton's maximum expiration date as November 4, 2005. From that date, the DOC applied Staton's good conduct credits, including his past credits. The DOC, however, recalculated and reduced Staton's past credits because his new term of confinement included a crime of violence. It halved the credits that Staton had accrued on the 1993 sentences, then subtracted the 100 days that the parole commissioner revoked. This reduction extended Staton's incarceration by six months.

Staton challenged the DOC's rationale for recalculating his credits as precisely the type of "blind aggregation" of sentences that the Court of Appeals has disapproved in a series of decisions. He filed a petition for *habeas corpus* against Warden J. Michael Stouffer, appellant, alleging that the reduction of his past good conduct credits violated his federal and Maryland constitutional rights.

The Circuit Court for Baltimore City granted Staton's petition, and ordered Staton's immediate release from incarceration. Staton was released on the same day the order was entered. When the briefs in this appeal were filed, he remained conditionally free under the supervision of the Division of Parole and Probation.

Through Warden Stouffer,[5] the DOC asks us to reverse the *habeas* court. Renewing its single term of confinement ratio-

---

5. Because the warden has been named solely in his official capacity, we recognize that Staton's dispute is with the DOC and its diminution

nale, the DOC argues that the court erred in holding that Staton was entitled to past good conduct credits that he accrued at the higher rate.

### DISCUSSION

To resolve this appeal, we must examine the interplay between two subtitles in the Correctional Services Article—section 3–700 *et seq.*, governing diminution credits, and section 7–500 *et seq.*, governing mandatory supervision.

■ Under the diminution credits subtitle, each inmate "is entitled to a diminution of the inmate's term of confinement as provided under [the diminution credits] subtitle," subject, however, "to § 3–711 ... and Title 7, Subtitle 5" of the Correctional Services Article. CS § 3–702. Once an inmate has accumulated enough good conduct and other diminution credits to earn entitlement to release, "the inmate is deemed released under 'mandatory supervision.' " *Frost v. State*, 336 Md. 125, 128, 647 A.2d 106 (1994).

Section 3–711 in the diminution credits subtitle specifically addresses what happens to an inmate's past good conduct credits when he or she commits a new crime while on parole:

If an inmate is convicted and sentenced to imprisonment for a crime committed while on parole and the parole is revoked, diminution credits that were awarded before the inmate's release on parole may not be applied toward the inmate's term of confinement on return to the [DOC].

In contrast, the mandatory supervision provisions now codified in Title 7, Subtitle 5 did not explicitly address the topic of past credits until very recently. Inmates sentenced to serve more than 12 months are "grant[ed] a conditional release from confinement" once they have "served the term or terms, less diminution credit[s][.]" CS § 7–501. When released on mandatory supervision, they "remain[ ] in legal custody" until their "full term" expires. CS § 7–502(a). In addition, they are

credits policy. We therefore frame our discussion as a dispute between Staton and the DOC.

"subject to ... all laws, rules, regulations, and conditions that apply to parolees[.]" CS § 7–502(b).

■ The good conduct diminution credits with which we are concerned in this case accrue as a matter of law, rather than at the discretion of correctional authorities. *See* CS § 3–702, § 3–704. Good conduct credits are a behavioral incentive and a means of reducing prison overcrowding. *See Md. House of Corr. v. Fields,* 348 Md. 245, 264, 703 A.2d 167 (1997); *Frost,* 336 Md. at 139, 647 A.2d 106. For those reasons, good conduct credits are applied as "a deduction in advance from the inmate's term of confinement." [6] CS § 3–704(a).

From 1989 until 1999, revocation of mandatory supervision was governed by former Article 41 section 4–612 of the Maryland Code. In 1996, subsection (e) provided that "[t]he Parole Commissioner presiding may rescind all diminution credits previously earned on the sentence or any portion thereof in the revocation proceedings." Md.Code (1957, 1993 Repl.Vol., 1996 Cum.Supp.), Art. 41 § 4–612(e).

---

**6.** Good conduct credits are calculated as follows:

(b) *Method of calculation.—*
(1) The deduction ... shall be calculated:
(i) from the first day of commitment to the custody of the Commissioner through the last day of the inmate's term of confinement;
(ii) except as provided in paragraph (2) of this subsection, at the rate of 10 days for each calendar month; and
(iii) on a prorated basis for any portion of a calendar month.
(2) If an inmate's term of confinement includes a consecutive or concurrent sentence for a crime of violence ... or [certain] crime[s] of manufacturing, distributing, dispensing, or possessing a controlled dangerous substance ..., the deduction ... shall be calculated at the rate of 5 days for each calendar month.
(c) *Exempt periods.—*A deduction under this section may not be allowed for a period during which an inmate does not receive credit for service of the inmate's term of confinement, including a period:
(1) during which the inmate's sentence is stayed;
(2) during which the inmate is not in the custody of the Commissioner because of escape; or
(3) for which the Maryland Parole Commission has declined to grant credit after revocation of parole or mandatory supervision.
CS § 3–704.

During that same time period, in 1991, the General Assembly adopted the "term of confinement" concept as part of the diminution credits provisions, which at that time were in Article 27 section 700 of the Code. *See* 1991 Md. Laws, ch. 354. *See, e.g., Sec'y of Pub. Safety & Corr. Servs. v. Hutchinson,* 359 Md. 320, 329, 753 A.2d 1024 (2000)(reviewing legislative history of provisions relating to revocation of credits in conjunction with revocation of mandatory supervision); *Frost,* 336 Md. at 141–42, 647 A.2d 106 (same). An inmate's term of confinement is "the period from the first day of the sentence that begins first through the last day of the sentence that ends last[.]" CS § 3–701(2). The reason for the change from calculating diminution credits against a sentence to calculating them against a term of confinement was " 'to ensure that inmates serving more than one sentence at a time [would] not receive good-conduct credits for more than one sentence.' " *Fields,* 348 Md. at 264–65, 703 A.2d 167. The next year, in 1992, the legislature created the rate differential for good conduct credits by amending Article 27. *See Sec'y, Dep't of Pub. Safety & Corr. Servs. v. Henderson,* 351 Md. 438, 451–52, 442, 718 A.2d 1150 (1998).

But no related changes were made to the language of Article 41 section 4–612(e) until 1999, when the new Correctional Services Article was enacted, and section 4–612(e) was recodified as CS section 7–504(a). *See* 1999 Md. Laws, ch. 54, § 1 (effective Oct. 1, 1999). The new mandatory supervision subtitle used the "term of confinement" concept for the first time, providing that "[t]he commissioner presiding at an individual's mandatory supervision revocation hearing may revoke any or all of the diminution credits previously earned by the individual on the individual's term of confinement." *See* former Md.Code (1999), § 79–504(a) of the Correctional Services Article. The Revisor's Note stated that "[t]his section is new language derived without substantive change from former Art. 41, § 4–612(e)[.]"

In 2002, the General Assembly substantively amended both section 7–504 and section 7–502 to extend the same prohibition against the use of past credits after revocation of parole under

section 3–711 to revocation of mandatory supervision. *See* 2002 Md. Laws, chs. 485, 486. We set forth current sections 7–502 and 7–504, with the provisions added by the 2002 amendment in boldface type:

§ 7–502. Legal custody.

(a) *In general.*—An individual on mandatory supervision remains in legal custody until the expiration of the individual's full term.

(b) *Applicability of laws, rules, regulations, and conditions relating to parolees.*—An individual on mandatory supervision is subject to:

(1) all laws, rules, regulations, and conditions that apply to parolees . . . .

(c) **Application for diminution credits.—If an inmate is convicted and sentenced to imprisonment for a violent crime committed while on mandatory supervision and the mandatory supervision is revoked, diminution credits that were awarded before the inmate's release on mandatory supervision may not be applied toward the inmate's term of confinement on return to the Division.**

§ 7–504. Revocation of mandatory supervision; **diminution credits.**

(a) *"Term of confinement" defined.*—**In this section, "term of confinement" has the meaning stated in § 3–701 of this article.**

(b) *Diminution credits previously awarded.*—(1) The commissioner presiding at an individual's mandatory supervision revocation hearing may revoke any or all of the diminution credits previously earned by the individual on the individual's term of confinement.

(2) **Nothing in this section affects the prohibition against the application of diminution credits under § 7–502 of this subtitle to the term of confinement of an inmate convicted and sentenced to imprisonment for a crime committed while on mandatory supervision.**

(c) *New diminution credits prohibited.*—After an inmate's mandatory supervision has been revoked, the inmate may

not be awarded any new diminution credits **on the term of confinement for which the inmate was on mandatory supervision.**

For consistency, our discussion will refer to the subsections in sections 7–502 and 7–504 as they are currently numbered.

The obvious effect of the 2002 amendments was to prohibit inmates who, like Staton, had their mandatory supervision revoked because they committed another crime while on mandatory supervision, from using **any** of the past diminution credits that they accrued before being released. But these new additions to sections 7–502 and 7–504 were not a part of the statutory scheme in 1996, when the Parole Commission revoked Staton's mandatory supervision. And the DOC tacitly concedes that, under those prior provisions, Staton is entitled to at least half of the good conduct credits that he accrued before being released on mandatory supervision.

In the absence of explicit language authorizing the DOC to recalculate and reduce Staton's past credits, the DOC relies on a strict application of the concept and definition of "term of confinement[.]" The DOC used the following formula to halve Staton's past credits, on the theory that, under section 3–704, once Staton's term of confinement included a violent crime sentence, his original sentences were no longer eligible for the higher ten credit per month rate:

| | | |
|---|---|---|
| 333 | GCC | (credits Staton accrued before MSR) |
| ÷ | 2 | (divided by two, to adjust rate from 10 GCC/mo. to 5 GCC/mo.) |
| = 167 | | (equals remaining credits) |
| − 100 | | (minus credits revoked by MPC) |
| = 67 | | **(equals surviving credits)** |

Staton believes that revocation had no effect on the past good conduct credits he accrued before mandatory release. His formula for calculating his surviving credits is therefore simple:

| | | |
|---|---|---|
| 333 | GCC | (credits Staton accrued before MSR) |
| − 100 | GCC | (minus credits revoked by MPC) |
| = 233 | GCC | **(equals surviving credits)** |

In Staton's view, the *habeas* court correctly determined that he was entitled to these credits because (1) the DOC had no

authority to alter the results of the Parole Commission's decision regarding how many of his past credits to revoke, (2) the DOC cannot aggregate the original sentences with the new sentence due to the break in DOC custody while Staton was released on mandatory supervision, (3) the DOC's new administrative interpretation of these statutory provisions violates the *ex post facto* clause of the Constitution, and (4) the DOC's interpretation of the diminution credits and mandatory supervision subtitles violates the rule of lenity.

We found no reported decision addressing the past credits issue presented here—the effect of revoking mandatory supervision on credits that an inmate accrued before release under the statutory scheme that was in effect in 1996. But the Court of Appeals has considered the "single term of confinement" concept in several diminution credits disputes, and its resolution of those conflicts is instructive.

In *Md. House of Corr. v. Fields,* 348 Md. 245, 703 A.2d 167 (1997), the Court resolved complaints by inmates whose terms of confinement included sentences imposed both before and after the legislature raised the monthly rate for good conduct credits from five to ten for certain crimes. The Court concluded that "it would be impossible to say that a single 'term of confinement' was imposed either before or after [the date of the rate change] because, in fact, 'the term of confinement was imposed both before *and* after that date.'" *Henderson,* 351 Md. at 444, 718 A.2d 1150 (quoting *Fields,* 348 Md. at 266, 703 A.2d 167). As a result of the ambiguity in how to treat the inmates' terms of confinement, the Court "invoke[d] the rule of lenity, requiring that the ambiguity be construed 'against the state and in favor of the [inmate].'" *Id.* (quoting *Fields,* 348 Md. at 267, 703 A.2d 167).

In *Beshears v. Wickes,* 349 Md. 1, 706 A.2d 608 (1998), the Parole Commission revoked mandatory supervision after Wickes committed a new crime. Wickes complained that the DOC refused to recognize good conduct credits that he accrued at the higher rate because his term of confinement included a sentence that was not eligible for that higher rate.

As in *Fields*, the Court of Appeals relied on the rule of lenity in rejecting the DOC's single term of confinement rationale for using the lower rate. *See Henderson*, 351 Md. at 451–52, 718 A.2d 1150.[7] The Court emphasized the ambiguity arising from the statutory provisions creating a single term of confinement and those creating the differentiated rate for good conduct credits. "[T]o the extent that the device of a single term of confinement would frustrate [the General Assembly's] direction" that inmates accrue ten days per month for non-violent, non-drug sentences imposed on or after October 1, 1992, "an ambiguity was created—an ambiguity that the rule of lenity required be resolved in favor of the inmate." *Id.*

In *Henderson*, the Court rejected the converse formula for calculating good conduct credits—that *all* sentences must be treated separately for purposes of accruing such credits. *See id.* at 452, 718 A.2d 1150. The DOC had interpreted the *Fields* and *Wickes* decisions as a mandate to calculate good conduct credits separately against each sentence. In Henderson's case, the DOC's recalculation resulted in the DOC reincarcerating him after he had been released on mandatory supervision. The Court of Appeals held that the DOC should not have done so, because aggregation of Henderson's sentences, both of which accrued good conduct credits at the lower rate, was consistent with the legislative mandate. *See id.* at 452–53, 718 A.2d 1150. Thus, "Henderson's reincarceration was unlawful because it was not authorized by statute, and he was entitled to be released for that reason." *Id.* at 452, 718 A.2d 1150.

In reaching that conclusion, the Court of Appeals reaffirmed the appellate mantra that governs every decision regarding whether the single term of confinement concept requires aggregation of sentences for purposes of calculating diminution credits:

---

7. The *Henderson* Court disavowed the broader alternative rationale announced in *Wickes*, pointing out that the rule of lenity "reasoning fully justified the holdings in both" *Fields* and *Wickes*. *See Henderson*, 351 Md. at 452, 718 A.2d 1150.

[A]ll sentences that overlap or run consecutively do not need to aggregate *"for all purposes* to a single term of confinement."

*Henderson,* 351 Md. at 452, 718 A.2d 1150 (quoting *Fields* )(italics in *Henderson;* bold added).

In *Sec'y of Pub. Safety & Corr. Servs. v. Hutchinson,* 359 Md. 320, 753 A.2d 1024 (2000), the Court of Appeals resolved another single term of confinement argument in a case involving mandatory supervision. Hutchinson committed a drug offense while he was released on mandatory supervision. In 1996, the Parole Commission revoked his mandatory supervision and all of his past good conduct credits. Hutchinson was returned to the DOC to serve the remainder of the sentence for which he had been released on mandatory supervision, as well as a new sentence. *See id.* at 323, 753 A.2d 1024.

At that time, section 4–612(f) stated simply that inmates on mandatory supervision "may not earn any new diminution credits once the mandatory supervision has been revoked." *See* former Md.Code (1957, 1993 Repl.Vol., 1996 Cum.Supp.), Art. 41 § 4–612(f); *Hutchinson,* 359 Md. at 322, 753 A.2d 1024. All agreed that this provision, and its successor at current CS § 7–504(c), "preclude[d] the award of any future diminution credits against the sentence(s) the inmate was serving when placed on mandatory supervision." *Hutchinson,* 359 Md. at 327, 753 A.2d 1024. "The question [was] whether it also preclude[d] the award of [future] credits against any new sentence imposed" before the inmate completed the remainder of his original sentence. *Id.*

Hutchinson complained that the DOC was not crediting him with any new good conduct credits on his new sentence until he served his original sentence in full, thereby preventing him from accruing all of the credits to which he was entitled. *See id.* He "urge[d] that credits may be awarded against the new sentence from the time of its imposition." *Id.* Applying the statutory definition of "term of confinement" to current section 7–504(c), Hutchinson argued that his sentences were aggregated into a single term of confinement and he therefore

should be permitted to apply credits that were accruing against the new sentence to his term of confinement, "which would have the effect of applying them to the 'old' sentence as well." *Id.* at 328, 753 A.2d 1024.

This time the DOC opposed aggregating Hutchinson's sentences into a single term of confinement for the purpose of calculating credits. It argued that Hutchinson's strict application of the term of confinement concept to current section 7–504(c) "would lead to the absurd result of an inmate who commits a new crime and receives a new sentence while on mandatory supervision serving less time upon revocation of the mandatory supervision than an inmate who does not commit a new crime and receives no new sentence but whose mandatory supervision is revoked for other reasons." *Id.* The DOC posited that "diminition credits *may* be awarded against a new sentence, but not until the 'old' sentence has been fully served." *Id.* at 327, 753 A.2d 1024.

The Court of Appeals rejected both approaches, in favor of an interpretation that was consistent with what it viewed as the legislature's "abundantly clear" intent to prevent inmates from accruing any new diminution credits against the sentences they were serving when placed on mandatory supervision. *See id.* at 328–31, 753 A.2d 1024. The Court found a "common sense way" to read section 7–504(c) to carry out "the legislative intent without presenting the anomaly posited by the [DOC]." *Id.*

Writing for the Court, Judge Wilner began by "noting the obvious" lack of any solution in the language of the Correctional Services Article:

Neither § 7–504[c] nor any other statute that can be read in context with it clearly states, one way or the other, whether the prohibition applies to new sentences after an inmate is released on mandatory supervision. The statute itself is silent in that regard.

*Id.* at 328, 753 A.2d 1024. Legislative history was similarly unenlightening. *See id.*

The Court turned instead to the contextual history of section 7–504 for clues to whether the legislature intended the interplay that Hutchinson envisioned between the term of confinement, diminution credit, and mandatory supervision provisions.

If there is an inference to be drawn, it would arise from reading former §§ 4–612(e) and (f)—current § 7–504[b] and [c] ... together, in light of the circumstances existing at the time of their enactment. Section 4–612(e)—current § 7–504[b]—permits the Parole Commission, upon revocation of mandatory supervision, to rescind all diminution credits previously earned, which can apply only to the sentence(s) being served when the inmate was placed on mandatory supervision. Section 4–612(f)—current § 7–504[c]—can then be read as complementing that provision by making clear that no new credits may be applied against *that sentence*. It is not always the case that there will be a new sentence, and it is reasonable to infer that the Legislature's focus was only on the sentence still being served by the inmate while on mandatory supervision. The penalty for violating a condition of mandatory supervision was service in full of the existing sentence. That approach is fully consistent with the fact that, when the provision was first enacted in 1989, the law did not aggregate multiple sentences into a single term of confinement but regarded them as separate and independent. The aggregation of multiple sentences into a single term of confinement was not authorized until 1991. If the Legislature, in 1989, had intended that the prohibition against future diminution credits apply to any sentence other than the one the inmate was serving when placed on mandatory supervision, it likely would have said so.

*Id.* at 328–29, 753 A.2d 1024 (citation omitted).

The Court then observed that this statutory interpretation was one that had been tentatively proposed by those charged with recodifying the correctional services laws. Uncertainty as to whether that interpretation was consistent with legislative intent, however, had prompted the Correctional Services

Article Review Committee to recommend that the General Assembly amend the statute " 'to state expressly that an inmate may not be awarded any diminution credits on the sentence or sentences for which the individual was awarded diminution credits prior to release on mandatory supervision.' " *See id.* at 329–30, 753 A.2d 1024.

As the *Hutchinson* Court noted, "[u]nfortunately, the General Assembly chose not to address the matter, perhaps in the belief that the interpretation suggested by the Correctional Services Article Review Committee was correct and that no clarification was necessary." *Id.* at 330, 753 A.2d 1024. The Court emphasized that "[c]larification *is* necessary, however, and it falls to us to provide it." *Id.*

The lesson that the Court of Appeals drew from *Fields, Wickes,* and *Henderson* was that "[a] result that appears quite reasonable in one circumstance may appear to be unreasonable in another." *Id.* For that reason, "[t]he issue, ultimately, is one of legislative intent." *Id.*

The *Hutchinson* Court found that there was a clear legislative intent with respect to accruing new good conduct credits against a releasee's original sentence. "One thing that seems abundantly clear is that the General Assembly did not intend for there to be any future diminution credits applied against the sentence(s) the inmate was serving when placed on mandatory supervision." *Id.*

The clear legislative intent regarding future credits allowed the Court to interpret the statute in a way that fairly implemented the General Assembly's policy mandate. *See id.* at 331, 753 A.2d 1024. The Court rejected Hutchinson's single term of confinement rationale because it would permit him to apply future diminution credits accruing on his new sentence to reduce the remainder of his original sentence that he had been returned to serve in confinement—a result that was inconsistent with the legislature's intent. *See id.* at 330, 753 A.2d 1024. The Court again acknowledged that it was "subordinat[ing] the general direction to aggregate multiple sentences into a single term of confinement [because] to do

otherwise" would have conferred a benefit that the General Assembly prohibited. *See id.* It held that, "[f]or purposes of applying § 7–504[c], the existing sentence(s), on the one hand, and any new sentences(s), on the other, must be considered separately." *Id.* at 330–31, 753 A.2d 1024.

The consequence of treating the two sentences separately required the Court also to reject the DOC's contention that section 7–504(c) prevented Hutchinson from accruing any good conduct credits against his new sentence until he had completed his old sentence. That "position also fails to carry out the legislative intent, for it would deny prisoners the full benefit of the laws ... allowing diminution credits against the new sentence(s)." *Id.*

The Court's "middle ground" solution permitted Hutchinson to accrue and apply credits against the eligible portion of his term of confinement, without using them to reduce the ineligible portion:

Prisoners who receive a new sentence(s) for conduct committed while on mandatory supervision should receive, and must be given, good conduct credits on that sentence(s) as though there were no existing sentence(s).... The prisoner gets no benefit from them with respect to the existing sentence, which he or she must serve in full, subject only to whatever preexisting credits are appropriately allowed against that sentence(s).

*Id.*[8]

Staton cites *Hutchinson*, as well as *Fields*, *Wickes*, and *Henderson*, in support of the proposition that the DOC must

---

**8.** More recently, in *Geddings v. Filbert*, 144 Md.App. 95, 796 A.2d 834 (2002), we applied these lessons to an inmate who committed a new crime while on parole. Geddings theorized that, since he was on parole for an earlier crime at the time he committed a new crime, his new sentence would aggregate with his old sentences, creating a single 42 year term of confinement against which he could use his past credits. We held that Geddings could not use credits that he accrued against his earlier sentences to reduce his term of confinement on his new sentence because the Parole Commission never revoked his parole. *See id.* at 103–06, 796 A.2d 834. Geddings' two sentences did not

treat his sentences separately for purposes of calculating his good conduct credits.[9] We do not think that any of these cases **mandates** that result. To the contrary, as the *Hutchinson* Court emphasized, a "one rule fits all" solution regarding sentence aggregation is neither wise nor possible given the myriad permutations and unique consequences presented by each case. *See id.* at 330, 753 A.2d 1024.

Here, the question and circumstances we address materially differ from *Hutchinson*. There, the Court of Appeals re-

---

create a single term of confinement; "[a]ny sentence being served on parole or mandatory supervision ... is not aggregated into a term of confinement because it is not being served in 'confinement.'" *Id.* at 105, 796 A.2d 834. In contrast, Staton's mandatory supervision was revoked, so that he was serving his original sentences "in confinement" when he returned to the DOC to complete the remainder of his original sentences, creating a single term of confinement.

9. Staton also cites our discussion of these Court of Appeals cases in *Smith v. State*, 140 Md.App. 445, 460–61, 780 A.2d 1199 (2001). In that case, we held that Smith was entitled to accrue special project credits against an eligible sentence in his term of confinement once he finished serving his ineligible sentence. In doing so, we observed that these four "cases demonstrate that the Court of Appeals already has considered and rejected attempts to narrow eligibility for diminution credits by using the 'term of confinement' concept to deny an inmate credits against a sentence that is eligible for them." *Id.* at 460, 780 A.2d 1199. In our view, "the broader lesson of these 'good conduct' cases [was] that diminution credits, once they are created, should be earned and calculated against the eligible sentence of an inmate rather than against his or her entire term of confinement." *Id.* at 461, 780 A.2d 1199.

These observations should not be read as a blanket rejection of the "term of confinement" rationale for aggregating eligible and ineligible sentences in every instance, without regard to the specific language of the provision creating such credits. Our comments reflected that the DOC regulations creating the double celling credits in question specifically stated that inmates would be ineligible for such credits if they were not " 'serving a ... [s]entence for murder[.]' " *Id.* at 451, 461, 780 A.2d 1199 (emphasis added). Smith was serving a murder sentence and a consecutive robbery sentence. We held that if Smith was no longer serving his murder sentence, he was entitled, under the terms of the DOC regulation, to accrue special project credits against his robbery "sentence." *See id.* at 461–63, 780 A.2d 1199. We remanded to the circuit court for a determination of whether Smith had completed his murder sentence, and "whether he earned and retained special project credits for the time he doubled celled thereafter[.]" *Id.* at 463, 780 A.2d 1199.

solved how to treat **future** diminution credits against a **new** sentence that **undisputedly** accrued good conduct credits at the **lower** rate of five per month. Here, we must resolve how to treat **past** diminution credits against the **original** sentences, which **arguably** accrued good conduct credits at the **higher** rate of ten per month.

Thus, *Hutchinson* does not dictate that Staton's sentences be considered separately for purposes of calculating his good conduct credits. What *Hutchinson* does require, however, is that (1) the mandatory supervision and diminution credits provisions be interpreted in a manner that is consistent with legislative language and intent, and (2) the single term of confinement concept may not be used to thwart that legislative intent. We proceed to analyze the DOC's statutory interpretation in light of these principles.

■ As in *Hutchinson*, the statutory language here yields no definitive answer. At the time Staton's mandatory supervision was revoked, the diminution credits and mandatory supervision provisions were silent regarding how to treat releasees' past good conduct credits in these circumstances. By its terms, section 4–612(f), and its successor section 7–504(c), address only "new diminution credits after the inmate's mandatory supervision has been revoked." Section 4–612(e), and its successor section 7–504(b), state that the commissioner presiding at an individual's mandatory supervision revocation hearing may revoke any or all of the diminution credits previously earned on the original sentence, but do not specify whether past credits also may be reduced "automatically" by the DOC as a secondary but unstated consequence of the parole commissioner's decision to revoke mandatory supervision.

*Hutchinson* teaches that, despite this silence, we must examine these statutory provisions in historical context to determine whether there is otherwise a clear legislative intent on the question before us. The *Hutchinson* Court was able to discern from the provenance of section 7–504(c) that the legislature intended to prohibit new diminution credits against

the original sentence after revocation of mandatory supervision.

What distinguishes this case from *Hutchinson* is that, unlike the legislature's policy regarding future credits in these circumstances, its policy regarding past credits is not "abundantly clear[.]" *See Hutchinson,* 359 Md. at 330, 753 A.2d 1024. For the reasons set forth below, we cannot discern a clear legislative intent to use the term of confinement concept in the diminution credits subtitle as a means of restricting the revocation provisions in the mandatory supervision subtitle.

Preliminarily, we note that we cannot divine a legislative position on this "automatic reduction" question from past or present provisions. In every instance that the legislature has specified a consequence for committing a crime while on parole or mandatory supervision, it explicitly has prohibited the use of **any and all** diminution credits. Section 3–711 prevents inmates whose parole is revoked because they committed crimes while on parole from using any past credits. Current section 7–504(c) and former section 4–612(f) prohibit inmates whose mandatory supervision has been revoked from accruing any new diminution credits. Recently enacted sections 7–502(c) and 7–504(b) also prohibit these inmates from using any past credits.

Undaunted by the lack of explicit statutory language or precedent, the DOC believes that the legislature implicitly intended to penalize any "inmate who, like Staton, has received a sentence for a crime of violence after October 1, 1992," by explicitly requiring in CS section 3–704(b)(2) "that an inmate whose term of confinement 'includes a consecutive or concurrent sentence for a crime of violence' shall be awarded good conduct credits at the rate of five days per month."

There is logic in the DOC's interpretation of the diminution credits subtitle. The General Assembly created the good conduct credit rate differential in 1992, only one year after it adopted and defined the "term of confinement" concept. *See Henderson,* 351 Md. at 441, 718 A.2d 1150. When it did so, the General Assembly understood that sentences aggregated

as a result of the term of confinement concept would cause some inmates to accrue credits at the lower rate even though they would have accrued credits at the higher rate on a particular sentence within their terms of confinement. Indeed, section 3–704(b)(2) mandates a rate reduction in these circumstances.

The legislature also contemplated that an inmate's misbehavior could prevent him from using good conduct credits. It authorized the DOC to revoke "a portion or all" of an inmate's good conduct credits for disciplinary violations. *See* CS § 3–709(a). It also prohibited parolees from using past credits once they have been convicted and sentenced for a crime committed while on parole and parole was revoked. *See* CS § 3–711. Because "an individual on mandatory supervision is subject to ... all laws ... that apply to parolees[,]" *see* CS § 7–502(b)(1), it is not unreasonable to conclude from these statutory provisions that the legislature intended the forfeiture provision in section 3–711 to apply also to releasees who commit crimes while on mandatory supervision.

Nevertheless, there also is logic in Staton's conflicting interpretation of the mandatory supervision subtitle. In his view, section 4–612(e) and current section 7–504(b) prohibit the DOC from recalculating his credits because the automatic reduction that the DOC took as a result of the parole commissioner's decision to revoke Staton's mandatory supervision thwarts the statutory scheme in which the parole commissioner has discretionary power to "revoke any or all of the diminution credits previously earned[.]" Staton reads sections 4–612(e) and 7–504(b) as evidence that the legislature intended that decisions regarding releasees' past diminution credits would be made by independent parole commissioners who have discretionary authority to revoke none, some, or all past credits on a case by case basis, but only after a formal hearing on the record, at which inmates have been afforded substantive and procedural rights.[10] *See* CS § 7–504(b).

---

**10.** Proceedings before a parole commissioner to revoke mandatory supervision are administrative hearings and are subject to judicial

We agree with Staton that sections 4–612(e) and 7–504(b) clearly reflect such an intent. But we see nothing explicitly stating that the General Assembly intended this to be the only way a releasee's past credits can be reduced as a result of revocation.

That inference might be drawn, however, from other statutory provisions concerning the relationship between diminution credits and mandatory supervision. In section 3–702, the General Assembly explicitly directs that an inmate's entitlement to diminution credits is "[s]ubject to . . . Title 7, Subtitle 5" governing mandatory supervision. Section 7–502(b)(1) also affords inmates facing revocation of mandatory supervision the same due process rights that parolees have, including rights under section 7–401 to an on-the-record hearing and decision, which are subject to judicial review. *See, e.g.,* CO-MAR 12.08.01.22 (regulations governing proceedings to revoke either parole or mandatory supervision). These provisions, and the lack of any explicit language restricting the number of past credits that the parole commissioner may revoke, suggest that, to the extent that the term of confinement concept conflicts with the grant of authority and procedural due process rights conferred in the mandatory supervision provisions, the General Assembly intended to "subordinate [its] general direction to aggregate multiple sentences into a single term of confinement," to ensure that inmates receive the benefit of an individualized decision regarding revocation of past credits. *Cf. Hutchinson,* 359 Md. at 330, 753 A.2d 1024 (concluding that subordinating term of confinement concept to provisions of current section 7–504(c) was necessary to enforce legislative intent); *Frost,* 336 Md. at 142–43, 647 A.2d 106 (legislature's provision that accrual of diminution credits provision is "subservient" to mandatory release provision made it "unreason-

---

review. *See* CS § 7–401; § 7–502(b)(1); § 7–504(a); COMAR 12.08.01.22 (hearings to revoke parole or mandatory supervision "are conducted as an adversary proceeding and are subject to judicial review"; mandatory releasees are entitled to be represented by counsel, to call and subpoena witnesses, and to a record of the hearing).

able to conclude" that DOC could limit Parole Commission's authority to revoke "all" credits in revocation hearing).

Staton's fourth and "fallback" reason for affirming the *habeas* court is that the rule of lenity requires us to resolve any statutory ambiguities in his favor. That is the winning argument here. We conclude that the statutory scheme as it existed when Staton's mandatory supervision was revoked created an ambiguity that we cannot resolve by the same "legislative intent" yardstick that the *Hutchinson* Court used to resolve the section 7–504(c) ambiguity regarding future credits.

Nothing in the language or contextual history of the diminution credits and mandatory supervision provisions explicitly permits or prohibits strict adherence to the term of confinement concept in these circumstances.

- On the one hand, the mandatory supervision subtitle makes inmates on mandatory release subject to "all laws ... that apply to parolees," including presumably provisions that inmates who are convicted of committing a crime while on parole may not use any of their past diminution credits. *See* CS § 3–711; § 7–502(b).

- On the other hand, mandatory supervision provisions also afford inmates facing revocation of mandatory supervision the procedural rights that parolees enjoy, including the right to have a parole commissioner determine how many, if any, past credits to revoke after an on-the-record hearing at which the inmate has the right to counsel, to call witnesses, and to judicial review. The diminution credits provision establishing an inmate's entitlement to diminution credits is "[s]ubject to" the provisions of the mandatory supervision subtitle, including presumably these provisions governing revocation proceedings at which a parole commissioner has discretionary authority to revoke whatever number of past credits he or she finds appropriate. *See* CS § 3–702; § 7–401; § 7–502(b); § 7–504(b); CO-MAR 12.08.01.22.

We simply do not know which of these two alternatives the General Assembly intended in Staton's situation. Both statutory interpretations are possible and plausible. Under the rule of lenity, which "forbids the extension of punishment 'to cases not plainly within the language' of the statute," the uncertainty created by this statutory ambiguity must be resolved in Staton's favor. *See Henderson,* 351 Md. at 448, 451–52, 718 A.2d 1150. Following the lessons of *Fields, Wickes,* and *Henderson,* all we need say is that, to the extent that the device of a single term of confinement would thwart revocation rights that the General Assembly conferred in the mandatory supervision subtitle, an ambiguity exists that requires us to affirm the *habeas* relief granted by the circuit court.[11]

**JUDGMENT AFFIRMED. COSTS TO BE PAID BY APPELLANT.**

---

**11.** Doing so moots Staton's constitutional due process and *ex post facto* challenges.